AO 106 (Rev. 06/09) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of Virginia

JAN - 5 2018

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. 1:18-sw-008 |
| Apple iPhone, Model A1549 IMEI: 359303062902841 | ) ) ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A (incorporated by reference).

located in the _____Eastern_____ District of _____Virginia_____, there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B (incorporated by reference).

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § § 841, 846 | Possession with the Intent to Distribute Controlled Substances and Conspiracy |
| 18 U.S.C. § 924(c) | Use and Carry of a Firearm During and in Relation to a Drug Trafficking Crime |

The application is based on these facts:
See attached affidavit of Jonathan Boller, ATF Special Agent.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Jonathan Boller*

*Applicant's signature*

Jonathan Boller, ATF Special Agent

*Printed name and title*

Sworn to before me and signed in my presence.

/s/
Theresa Carroll Buchanan
United States Magistrate Judge

*Judge's signature*

Date: _____01/05/2018_____

City and state: Alexandria, Virginia

Theresa Carroll Buchanan, U.S. Magistrate Judge

*Printed name and title*

## ATTACHMENT A

The property to be searched is an Apple iPhone with IMEI: 359303062902841 (hereinafter referred to as "the Device").  The Device is currently located in the ATF Falls Church II evidence locker, which is located at 7799 Leesburg Pike, Falls Church, Virginia 22043, which is within the Eastern District of Virginia.

The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## ATTACHMENT B

1.      All records on the Device described in Attachment A that relate to violations of Title 21, United States Code, Sections 841(a)(1) and 846, and Title 18, United States Code, Section 924(c), and involve TARVELL VANDIVER, including:

      a.  Any conversations, whether through text messages or other applications, where VANDIVER discusses controlled substances and firearms;

      b.  lists of customers and related identifying information;

      c.  images or videos of controlled substances, firearms, or currency;

      d.  locations traveled to and from;

      e.  networks or devices the device has connected to;

      f.  types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

      g.  any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

      h.  any information stored within or related to applications;

      i.  any information recording VANDIVER's schedule or travel;

      j.  all bank records, checks, credit card bills, account information, and other financial records.

2.      Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

23

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

JAN - 5 2018

| IN THE MATTER OF THE SEARCH OF | |
|---|---|
| Apple iPhone, Model A1549 IMEI: 359303062902841 | |
| CURRENTLY LOCATED AT ATF Falls Church II Evidence Locker 7799 Leesburg Pike, Falls Church, Virginia 22043 | 1:18-sw-008 |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE**

I, Jonathan C. Boller, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a search warrant authorizing the examination of property—an

electronic device—which is currently in law enforcement possession, and the extraction from

those devices of electronically stored information described in Attachment B.

2.      I have been a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and

Explosives ("ATF") since 2016.  I have experience investigating narcotics and firearms

trafficking offenses.

3.      As an ATF Special Agent, I have investigated and assisted in the investigation of

narcotics and firearms traffickers.  I have previously participated in investigations, which

resulted in the arrest and conviction of narcotics and firearms traffickers.  I have also become

familiar with the methods and techniques associated with the distribution of narcotics and how

drug trafficking organizations work.  From 2014 to 2016, I served as a Special Agent with the United States Secret Service, where I received specialized training including certification in the Basic Investigation of Computer and Electronic Crimes Program.

4.       Based on my training and experience, and the experience of other law enforcement officers, in investigating narcotics and the distribution of narcotics while armed, I know that it is common for individuals engaged in this activity to use telephonic communications, both cellular (to include voice and text messages) and hard line, to further their criminal activities.  I know that "smart" phones play an integral role in the daily lives of individuals engaging in narcotics trafficking and that these individuals use cellular telephones to exchange information with customers and/or source(s) of supply through text messaging, instant messaging, and telephone conversations.  I also know that it is common for narcotics traffickers to use multiple "smart" phones to communicate with co-conspirators in order to compartmentalize their illegal activity and avoid detection by law enforcement.  Further, I know it is common for narcotics traffickers to change their phones and phone numbers in order to avoid detection by law enforcement.

5.       The facts and information contained in this affidavit are based upon my personal knowledge, information obtained from federal and state law enforcement officers, and information obtained from interviews and analysis of reports.

6.       This affidavit contains information necessary to support probable cause and is not intended to include each and every fact and matter observed by me or known to the government.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

7.       The property to be searched is an Apple iPhone with IMEI: 359303062902841 (hereinafter referred to as "the Device").  The Device is currently located in the ATF Falls

2

Church II evidence locker, which is located at 7799 Leesburg Pike, Falls Church, Virginia 22043, which is within the Eastern District of Virginia.

8.     The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

A.     Background on the Investigation

9.     In February 2017, a cooperating source ("CS-1") reported to the Prince William County Police Department that Tarvell Vandiver ("VANDIVER") was a narcotics distributor. CS-1 is a member of the Imperial Gangsta Blood ("IGB") gang. CS-1 will be referred to in the masculine gender, regardless of CS-1's true gender. CS-1 has been convicted of two felonies, including robbery and a probation violation. He was arrested in December 2016, in Prince George's County, Maryland, for possessing a stolen firearm as a convicted felon and possession of controlled substances. CS-1 originally cooperated because he hoped to receive a lesser sentence. Based on CS-1's cooperation, Prince George's County dismissed his charges. CS-1 continues to cooperate because he is being compensated. CS-1 also hopes to be relocated.

10.     In March 2017, ATF and the Federal Bureau of Investigation ("FBI") began jointly investigating Blood gang members to include VANDIVER and his associates involved in criminal activity in Northern Virginia.

11.     VANDIVER is currently charged via criminal complaint with conspiracy to distribute 280 grams or more of cocaine base.

12.     During the course of this investigation, law enforcement coordinated numerous controlled purchases of controlled substances from, or through, VANDIVER. In each instance where a cooperating source conducted a law enforcement directed purchase of controlled

3

substances, the cooperating source was searched for contraband before and after the transaction. During each transaction, audio and/or video recorders were used in conjunction with law enforcement surveillance.  Further, all of the controlled substances purchased were submitted for laboratory testing.  Below, I do not detail each and every purchase of controlled substances; rather, I focus only on the <u>significant</u> purchases for the purposes of this affidavit.  However, the below table does detail each law enforcement directed purchase in this investigation.

| Number | Date | Drug | Amount | Lab Test |
|--------|------|------|--------|----------|
| 1 | 03/02/2017 | Cocaine | 27.71 grams | Cocaine HCL |
| 2 | 03/11/2017 | Cocaine | 27.92 grams | Cocaine HCL |
| 3 | 03/23/2017 | Cocaine | 55.75 grams | Cocaine HCL |
| 4 | 03/28/2017 | Heroin | 3.55 grams | Fentanyl |
| 5 | 03/30/2017 | Cocaine | 123.12 grams | Cocaine HCL |
| 6 | 03/30/2017 | Heroin | 3.44 grams | Fentanyl/Heroin |
| 7 | 04/06/2017 | Cocaine Base | 108.82 grams | Cocaine Base |
| 8 | 04/06/2017 | Cocaine | 27.92 grams | Cocaine HCL |
| 9 | 04/25/2017 | Heroin | 75.17 grams | Fentanyl/Heroin |
| 10 | 05/02/2017 | Heroin | 86.40 grams | Heroin |
| 11 | 05/04/2017 | Cocaine Base | 185.10 grams | Cocaine Base |
| 12 | 05/09/2017 | Cocaine | 27.98 grams | Cocaine HCL |
| 13 | 05/10/2017 | Cocaine Base | 14.58 grams | Cocaine Base |
| 14 | 05/17/2017 | Cocaine Base | 25.75 grams | Cocaine Base |
| 15 | 05/18/2017 | Marijuana | 41.08 grams | Marijuana |

| Number | Date | Drug | Amount | Lab Test |
|--------|------|------|--------|----------|
| 16 | 05/24/2017 | Cocaine Base | 41.08 grams | Cocaine Base |
| 17 | 05/25/2017 | Heroin | 54.31 grams | Heroin |
| 18 | 06/01/2017 | Heroin | 49.49 grams | Heroin |
| 19 | 06/02/2017 | Cocaine Base | 41.97 grams | Cocaine Base |
| 20 | 06/08/2017 | Cocaine Base | 32.73 grams | Cocaine Base |
| 21 | 06/15/2017 | Heroin | 46.61 grams | Heroin |
| 22 | 06/16/2017 | Cocaine Base | 55.35 grams | Cocaine Base |
| 23 | 06/22/2017 | Cocaine Base | 66 grams est. | Lab Pending |
| 24 | 07/06/2017 | Cocaine Base | 29 grams est. | Lab Pending |
| 25 | 07/26/2017 | Cocaine Base | 27.40 grams | Cocaine Base |
| 26 | 07/27/2017 | Marijuana | 1,266.9 grams | Marijuana |
| 27 | 08/11/2017 | Cocaine Base | 54.13 grams | Cocaine Base |
| 28 | 08/17/2017 | Cocaine Base | 52.81 grams | Cocaine Base |
| 29 | 08/31/2017 | Cocaine Base | 369.89 grams | Cocaine Base |
| 30 | 10/30/2017 | Cocaine HCL | 505 grams est. | Lab Pending |

6

| Number | Date | Drug | Amount | Lab Test |
|--------|------|------|--------|----------|
| 31 | 11/09/2017 | Heroin | 43 grams est. | Lab Pending |

B.     First iCloud Search Warrant on April 3, 2017

13.     On April 3, 2017, the Honorable John F. Anderson, United States Magistrate Judge for the Eastern District of Virginia, authorized a search warrant for the VANDIVER's iCloud account. I have reviewed the returns for the iCloud account. The return from Apple includes critical information that corroborates that VANDIVER is a member of a conspiracy to distribute controlled substances.

14.     The information supplied by Apple in response to the search warrant included information that documented communication between parties using FaceTime. This information is not included in the information supplied by a court-authorized pen register and trap and trace device. This information specifically provided the phone numbers that VANDIVER communicated with on dates and times when other evidence supports that VANDIVER was arranging the sale of or was personally selling cocaine and other illegal substances or firearms. The phone numbers for multiple suspected co-conspirators were also included in records supplied by Apple. Further, CS-1 states that VANDIVER uses FaceTime to conceal records of his communications. Thus, VANDIVER uses FaceTime as his primary means to communicate with co-conspirators, when he is arranging the distribution of cocaine and other controlled substances.

15.     Since April 3, 2017, as explained below, VANDIVER has continued to use FaceTime to communicate with co-conspirators and arrange drug transactions. There is probable

7

cause to believe that communication records within the Device will once again corroborate when and with whom VANDIVER was communicating.

      C.    <u>Controlled Purchase of Cocaine from Tarvell Vandiver on March 30, 2017</u>

      16.    On March 30, 2017, CS-1 contacted VANDIVER on FaceTime and VANDIVER advised that he was at the Potomac Mills Mall. At law enforcement direction, CS-1 drove to the mall and met with VANDIVER. Both CS-1 and VANDIVER then entered VANDIVER's vehicle and made contact via phone with a co-conspirator ("Co-Conspirator 1"). Co-Conspirator 1 advised that he had just obtained seven (7) grams of heroin and CS-1 was welcome to travel to his residence and purchase heroin. After the call, VANDIVER drove CS-1 to Bellona Road, Woodbridge, Virginia. VANDIVER and CS-1 then entered an apartment, where VANDIVER weighed out approximately 130 grams of cocaine and provided it to CS-1 in exchange for $5,400.

      17.    VANDIVER then drove with CS-1 in VANDIVER's vehicle to the Coastal Station located at 2010 Old Bridge Road, Woodbridge, Virginia. VANDIVER then sold a half ounce of cocaine to an unidentified male. VANDIVER's movements were observed by law enforcement and later confirmed by CS-1.

      18.    VANDIVER then returned with CS-1 to Potomac Mills Mall, where CS-1 secured the cocaine that he purchased from VANDIVER in the glove box of his vehicle. CS-1 then returned to VANDIVER's vehicle. Law enforcement maintained surveillance on CS-1's vehicle in the parking lot until the operation was concluded.

      19.    VANDIVER then contacted Co-Conspirator 1 and arranged to meet at Co-Conspirator 1's residence in order for CS-1 to purchase heroin. VANDIVER later drove CS-1 to Co-Conspirator 1's residence and VANDIVER again contacted Co-Conspirator 1 to let him

know that they had arrived.  Co-Conspirator 1 came out of his residence and entered

VANDIVER's vehicle.  While in the vehicle, Co-Conspirator 1 sold four (4) grams of heroin to

CS-1 for $300.

20.     VANDIVER then drove CS-1 back to CS-1's vehicle located at the Potomac

Mills Mall.  CS-1 drove to a meeting location where law enforcement debriefed CS-1.  CS-1

provided law enforcement with the suspected cocaine, which field-tested positive for the

presence of cocaine.  CS-1 also provided law enforcement with the suspected heroin, which

field-tested positive for the presence of heroin.

D.     Controlled Purchase of Cocaine Base from Tarvell Vandiver on April 6, 2017

21.     At the direction of law enforcement, CS-1 contacted VANDIVER and arranged to

purchase two (2) ounces of cocaine base and one (1) ounce of cocaine from VANDIVER.

VANDIVER also advised that he would manufacture the cocaine into cocaine base.  While CS-1

was on his way to meet VANDIVER, VANDIVER called CS-1 on FaceTime and asked CS-1 to

pick up some baking soda (which is a common ingredient used to make crack cocaine).  CS-1

then travelled to the area where he and VANDIVER had arranged to meet.  VANDIVER then

advised CS-1 on FaceTime to come to the apartment on Bellona Road.

22.     CS-1 met VANDIVER outside of the apartment and the two entered the

apartment together.  According to CS-1, VANDIVER then took a phone call from a subject who

placed an order for cocaine.  While in the apartment, CS-1 stated that VANDIVER instructed

him in the cocaine base manufacturing process, including how much baking soda to mix with the

cocaine.  CS-1 observed VANDIVER manufacturing powder cocaine into cocaine base by using

baking soda, water, and a microwave to heat the mixture.

9

23.    VANDIVER then received an incoming phone call and agreed to meet a co-conspirator at the McDonald's located on Dale Boulevard.  VANDIVER and CS-1 then left the apartment, and while being surveilled by law enforcement, travelled to a McDonald's Restaurant located at 2891 Dale Blvd, Dale City, Virginia.  VANDIVER was then observed exiting his vehicle and meeting with a co-conspirator.  CS-1 later confirmed that VANDIVER sold an unknown amount of cocaine to the co-conspirator.

24.    VANDIVER then drove CS-1 to various other locations and then returned to the apartment located at Bellona Road.  VANDIVER then placed an outgoing FaceTime call to Rashourn Niles and explained that the cocaine base was still soft.  Niles then advised VANDIVER how to complete the drying process.  CS-1 observed this FaceTime call and observed VANDIVER using a microwave and hairdryer to complete the hardening process of the crack cocaine.  VANDIVER then made further statements advising CS-1 how to maximize his crack cocaine yield during the manufacturing process.  Niles is currently charged via criminal complaint with conspiring to distribute five kilograms or more of cocaine.

25.    CS-1 then provided $4,900 to VANDIVER in exchange for two (2) ounces of crack cocaine and one (1) ounce of cocaine.  CS-1 then drove to a meeting location where law enforcement debriefed CS-1.  CS-1 provided law enforcement with the suspected cocaine, which field-tested positive for the presence of cocaine.  While law enforcement ordered and paid for two ounces of crack cocaine, the purchased quantity weighed approximately 112 grams.

E.    Controlled Purchase of Cocaine and a Firearm from Tarvell Vandiver on May 9, 2017

26.    In the days leading up to May 9, 2017, VANDIVER contacted CS-1 and asked if he (CS-1) wanted to purchase a firearm.  At law enforcement direction, CS-1 agreed to purchase

a firearm and ordered one (1) ounce of cocaine.  CS-1 estimated the firearm and cocaine would cost approximately $2,000.

27.     Prior to the controlled purchase, law enforcement searched CS-1 and his vehicle and found it to be free of any illegal contraband.  Law enforcement then provided CS-1 with ATF agent cashier funds to conduct the controlled purchase.  The controlled purchase was also audio recorded.

28.     After departing the staging location, CS-1 contacted VANDIVER via FaceTime and was instructed to meet VANDIVER at a location on Bayside Avenue, Woodbridge, Virginia. Upon meeting VANDIVER in the parking lot, CS-1 entered his vehicle.  VANDIVER and CS-1 were observed driving to a gas station and then returning to the apartment on Bayside Avenue. Inside the apartment, CS-1 was sitting when VANDIVER asked him if he felt anything.  When CS-1 shifted his weight, he could feel something inside a pillow.  CS-1 opened the zipper and later reported VANDIVER cutout a portion of the foam inside one of the cushions.  CS-1 located approximately 4.5 ounces of powder cocaine inside clear plastic baggies.  VANDIVER stated that if law enforcement ever found the drugs hidden inside the pillow, that law enforcement could not prove his knowledge of the cocaine because he does not reside in the apartment.

29.     VANDIVER told CS-1 the price of cocaine increased from $1,300 to $1,400 and CS-1 agreed.  VANDIVER placed the 4.5 ounces of cocaine on the dining room table, weighed out one (1) ounce and placed it in a plastic bag.  VANDIVER also told CS-1 he was trying to make a $300 profit from the firearm CS-1 was going to purchase.  CS-1 agreed and provided VANDIVER with $2,000 in ATF agent cashier funds for the firearm and cocaine.  CS-1 took custody of the cocaine that he purchased and VANDIVER took custody of the remainder of the cocaine.

30.     VANDIVER and CS-1 then exited the apartment and entered VANDIVER's vehicle.  Law enforcement followed CS-1 and VANDIVER to a location within the Eastern District of Virginia, where VANDIVER was observed entering an apartment.  VANDIVER returned to his vehicle with a towel in his hand and was seen wiping an unidentified object.  Upon entering the vehicle, VANDIVER placed the firearm wrapped in a towel on the driver's seat near his legs.

31.     CS-1 and VANDIVER then drove in the VANDIVER's vehicle back to the Bayview Apartment complex and CS-1 entered his vehicle.  Upon arriving at the complex, VANDIVER handed CS-1 the firearm, which was a Smith & Wesson .40 caliber pistol, wrapped in the towel.  VANDIVER then left.

32.     CS-1 was followed to a meeting location where law enforcement debriefed CS-1.  CS-1 provided law enforcement with the suspected cocaine and firearm.  The cocaine field-tested positive for the presence of cocaine and had a field weight of approximately 30 grams.

F.      Purchase of two firearms from a Co-Conspirator in a deal setup by Tarvell Vandiver

33.     On July 27, 2017, CS-1, at law enforcement direction, contacted VANDIVER with the goal of obtaining firearms and distribution quantities of marijuana.  The communication occurred through FaceTime with CS-1 contacting VANDIVER on the account.  During this communication, and throughout the entirety of their association, CS-1 stated that VANDIVER would have been aware that CS-1 is a convicted felon.  Later that same day VANDIVER sent CS-1 images of the firearms that were available for sale.  Then, a co-conspirator sent his address to VANDIVER via Snapchat.  CS-1 later purchased two firearms from VANDIVER for $1,300.

12

34. On August 16, 2017, the Honorable John F. Anderson, authorized a search warrant for the contents of the Snapchat account for the co-conspirator that contacted VANDIVER via Snapchat. The communication log of this account shows multiple communications and images of the same firearms purchased by CS-1 from VANDIVER on July 27, 2017.

G. Controlled Purchases of Controlled Substances from Tarvell Vandiver since April 26, 2017

35. At law enforcement direction, CS-1 continued to purchase controlled substances, including powder cocaine, crack cocaine, heroin, and marijuana from VANDIVER. During this entire time period, CS-1 communicated with VANDIVER via FaceTime and iMessage. VANDIVER uses the account for his FaceTime calls and iMessages.

H. Tarvell Vandiver facilitation of a 500 gram cocaine purchase October 30, 2017

36. On October 30, 2017, CS-1, at law enforcement direction, was socializing with VANDIVER. While physically present with VANDIVER inside his apartment, CS-1 placed an order through VANDIVER for a half of kilogram, or approximately 18 ounces, of cocaine. CS-1 stated to law enforcement that after he placed the order through VANDIVER, VANDIVER contacted Niles through a series of Facetime and voice (telephone) calls. CS-1 further stated that VANDIVER then told CS-1 that Niles contacted individuals he (Niles) believed would be able to handle a transaction of that size. Approximately 45 minutes later, an individual arrived in the parking lot of VANDIVER's apartment building. VANDIVER exited his apartment and made contact with the individual in the car. VANDIVER exchanged $19,950 in ATF buy money, which CS-1 had provided to VANDIVER, for what later field-tested positive as cocaine, and field measured to be approximately 515 grams.

13

I.      Purchase of 151 grams of Heroin on November 28, 2017

37.     In the days leading up to November 28, 2017, CS-1, at law enforcement request, responded to an offer from VANDIVER and Niles to purchase heroin.  On November 26, 2017, VANDIVER provided CS-1 a free sample of heroin.  VANDIVER stated the heroin was from Niles and was a sample of the product Niles was distributing.  The sample was immediately turned over to ATF personnel.  Subsequent testing conducted by the DEA Mid Atlantic Laboratory revealed the substance to contain heroin.

38.     On November 27, 2017, CS-1 informed VANDIVER that he was interested in purchasing five (5) ounces of the same quality of heroin.  Late in the morning on November 28, 2017, CS-1 communicated with VANDIVER that he was in the area of VANDIVER's residence, and inquired if the heroin was available yet.  VANDIVER informed CS-1 that he was leaving to pick it up shortly.  A few minutes later CS-1 arrived at a location in the Eastern District of Virginia where VANDIVER resides.  Shortly thereafter, CS-1 and VANDIVER departed and were observed meeting with Niles.  Upon arriving in a parking lot a few minutes from VANDIVER's residence, CS-1 provided $11,500 to VANDIVER.  VANDIVER exited CS-1's vehicle and was observed entering a Black BMW X6 operated by Niles.  After driving around the parking lot for a few minutes, VANDIVER exited the vehicle and rejoined CS-1.  VANDIVER then provided what was later field weighed and estimated to be 151 grams of suspected heroin to CS-1.  This substance is currently awaiting analysis by the DEA Mid Atlantic Laboratory.

J.      Arrest of Tarvell VANDIVER on December 5, 2017

39.     On December 5, 2017, law enforcement arrested VANDIVER for conspiracy to distribute 280 grams or more of cocaine base.  After being placed under arrest, VANDIVER was

14

found to be in possession of the Device. The Device's SIM (Subscriber Identity Module) card was removed to isolate the phone from the network and preserve data on the Device. Newer mobile devices cannot be placed into airplane mode without a known password; thus, the SIM card was removed to preserve data. The SIM card is used to identify and authenticate subscribers on a mobile telephone network, it is considered part of the phone for purposes of the search. Once the SIM card is removed from a device, the device can no longer communicate with the network and therefore cannot receive commands such as a "wipe" which would delete data from the Device.

40.      The Device is currently in storage at 7799 Leesburg Pike, Falls Church, Virginia 22043, Virginia, which is located within the Eastern District of Virginia. In my training and experience, I know that the Device has been stored in a manner in which the contents are, to the extent material to this investigation, in substantially the same state, as they were when the Devices first came into the possession of the ATF.

41.      After a search warrant is obtained for the Device, ATF or FBI will begin the search of the Device within the Eastern District of Virginia. If ATF or FBI cannot complete the search then agents will send the Device to a private company that specializes in data extraction from Apple iPhones and other electronics. This private company will either (a) unlock the Device and then return the Device to the ATF or FBI office located in the Eastern District of Virginia, where the actual analysis of the contents of the Device will take place or (b) unlock the Device and create a forensic image of the Device, and then return the Device to the ATF or FBI office located in the Eastern District of Virginia, where the actual analysis of the contents of the Device will take place.

## TECHNICAL TERMS

42.     Based on my training and experience, I use the following technical terms to

convey the following meanings:

    a.  *Wireless telephone*:  A wireless telephone (or mobile telephone, or cellular

        telephone) is a handheld wireless device used for voice and data communication

        through radio signals.  These telephones send signals through networks of

        transmitter/receivers, enabling communication with other wireless telephones or

        traditional "land line" telephones.  A wireless telephone usually contains a "call

        log," which records the telephone number, date, and time of calls made to and

        from the phone.  In addition to enabling voice communications, wireless

        telephones offer a broad range of capabilities.  These capabilities include:  storing

        names and phone numbers in electronic "address books;" sending, receiving, and

        storing text messages and e-mail; taking, sending, receiving, and storing still

        photographs and moving video; storing and playing back audio files; storing

        dates, appointments, and other information on personal calendars; and accessing

        and downloading information from the Internet.  Wireless telephones may also

        include global positioning system ("GPS") technology for determining the

        location of the device.

    b.  *Digital camera*:  A digital camera is a camera that records pictures as digital

        picture files, rather than by using photographic film.  Digital cameras use a

        variety of fixed and removable storage media to store their recorded images.

        Images can usually be retrieved by connecting the camera to a computer or by

        connecting the removable storage medium to a separate reader.  Removable

16

storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. *Portable media player*: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. *GPS*: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When

17

a GPS antenna receives signals from at least four satellites, a computer connected

to that antenna can mathematically calculate the antenna's latitude, longitude, and

sometimes altitude with a high level of precision.

e. *PDA*: A personal digital assistant, or PDA, is a handheld electronic device used

for storing data (such as names, addresses, appointments or notes) and utilizing

computer programs. Some PDAs also function as wireless communication

devices and are used to access the Internet and send and receive e-mail. PDAs

usually include a memory card or other removable storage media for storing data

and a keyboard and/or touch screen for entering data. Removable storage media

include various types of flash memory cards or miniature hard drives. This

removable storage media can store any digital data. Most PDAs run computer

software, giving them many of the same capabilities as personal computers. For

example, PDA users can work with word-processing documents, spreadsheets,

and presentations. PDAs may also include GPS technology for determining the

location of the device.

f. *Internet*: The Internet is a global network of computers and other electronic

devices that communicate with each other. Due to the structure of the Internet,

connections between devices on the Internet often cross state and international

borders, even when the devices communicating with each other are in the same

state.

43.     Based on my training, experience, and research, and from consulting the

manufacturer's advertisements and product technical specifications available online at

http://www.apple.com/iphone/, I know that the Device has capabilities that allow it to serve as

the following: a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.

44.     In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

45.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

46.     *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

   a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b.  Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw

conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

47.   *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

48.   *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

49.     I submit that this affidavit supports probable cause for a search warrant

authorizing the examination of the Devices= described in Attachment A to seek the items

described in Attachment B.

Respectfully submitted,

Jonathan Boller
Special Agent
Bureau of Alcohol, Tobacco, Firearms and
Explosives

Subscribed and sworn to before me on January 5, 2018:

Theresa Carroll Buchanan
United States Magistrate Judge

The Honorable Theresa Carroll Buchanan
United States Magistrate Judge

21

## ATTACHMENT A

The property to be searched is an Apple iPhone with IMEI: 359303062902841 (hereinafter referred to as "the Device"). The Device is currently located in the ATF Falls Church II evidence locker, which is located at 7799 Leesburg Pike, Falls Church, Virginia 22043, which is within the Eastern District of Virginia.

The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

22

## ATTACHMENT B

1.      All records on the Device described in Attachment A that relate to violations of Title 21, United States Code, Sections 841(a)(1) and 846, and Title 18, United States Code, Section 924(c), and involve TARVELL VANDIVER, including:

  a.  Any conversations, whether through text messages or other applications, where VANDIVER discusses controlled substances and firearms;

  b.  lists of customers and related identifying information;

  c.  images or videos of controlled substances, firearms, or currency;

  d.  locations traveled to and from;

  e.  networks or devices the device has connected to;

  f.  types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

  g.  any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

  h.  any information stored within or related to applications;

  i.  any information recording VANDIVER's schedule or travel;

  j.  all bank records, checks, credit card bills, account information, and other financial records.

2.      Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

23